IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GARY SALERNO

        Plaintiff

v.                       3:CV-11-450
                        (JUDGE MARIANI)

CHAD CUNNINGHAM, et al.,

        Defendants

## MEMORANDUM OPINION

### I. Introduction

Plaintiff, Gary Salerno, brought suit against Defendants Cunningham and Bogarowski, Pennsylvania State Troopers, for malicious prosecution stemming from his arrest for driving under the influence on October 26, 2008. Before the Court is Defendants' Motion for Summary Judgment. (Doc. 18). For the reasons set forth below, the Court will grant in part and deny in part Defendants' motion.

### II. Undisputed Statement of Facts

Out of Defendants' 78 paragraphs contained in their Statement of Undisputed Facts (Doc. 20), Plaintiff contests only eight of them: paragraphs 20, 26, 31, 33, 35, 36, 37, 38. As such, the remaining 70 statements of fact are undisputed and are set forth as follows:

Plaintiff, Gary Salerno ("Salerno") is an adult individual living at 122 Father John Drive, Lake Ariel, PA 18436. (Pl's. SOF, Doc. 28, at ¶ 1). Defendant, Chad L. Cunningham

1

("Cunningham") is a Trooper First Class with the Pennsylvania State Police at the Honesdale City Police Barracks. (Id. at ¶ 2). Defendant John E. Bogarowski ("Bogarowski") is also a Trooper with the Pennsylvania State Police at the Honesdale Barracks. (Id. at ¶ 3).

On October 25th, 2008, Salerno and his wife had gone to BennOco's Beef and Brew at roughly 9:00 or 9:30 p.m. for pizza and drinks. (Id. at ¶ 4). Salerno and his wife left the bar after 1:00 a.m. on October 26, 2008. (Id. at ¶ 5). Salerno turned out of the parking lot at BennOco's Beef and Brew and he noticed a police car behind him. (Id. at ¶ 6). Salerno was driving a 2004 Dodge Dakota pickup truck with an open bed. (Id. at ¶ 7).

On October 25-26, 2008, Troopers Bogarowski and Cunningham were working the 11:00 p.m. to 7:00 a.m. shift. (Id. at ¶ 8). As of October 26, 2008, the State Police was just starting to implement mobile video recorders ("MVR") in all of its vehicles. (Id. at ¶ 9). The vehicle that Troopers Cunningham and Bogarowski were driving had an MVR installed as of October 26, 2008. (Id. at ¶ 10).

Salerno came to the intersection at the Easton Turnpike Standard Route ("SR") 191 and stopped at a red light and waited for the light to signal he could make a left turn. (Id. at ¶ 11). Trooper Cunningham was driving the police car behind the Salernos' vehicle on State Route 590. (Id. at ¶ 12). Salerno waited for the light to cycle to green, but it remained red, so he drove through it and made a left turn onto SR 191. (Id. at ¶ 13). Salerno pulled up to the stop light at approximately 1:30:50. The other traffic lights at the intersection went

through three light cycles while Salerno's light remained a steady red. Salerno turned left against the red light at approximately 1:34:10. (*Id.* at ¶ 14). Salerno does not recall whether there was a white line on the road indicating where his vehicle should stop for the light. (*Id.* at ¶ 15).

After Salerno drove through the light on SR 191, the State Police car's lights were turned on, and Salerno was pulled over. (*Id.* at ¶ 16). Trooper Cunningham got out of the police car and approached Salerno on the drivers' side of the vehicle. (*Id.* at ¶ 17). Trooper Cunningham told Salerno that the light did not change because Salerno's vehicle was too far forward to trigger the light. (*Id.* at ¶ 18).[1] Cunningham asked for Salerno's license, registration, insurance information and started a conversation with Salerno. (*Id.* at ¶ 19).

Trooper Bogarowski approached the passenger side of Salerno's vehicle and could smell alcohol coming from the vehicle while Cunningham spoke to Salerno and while the passenger side window was still up. (*Id.* at ¶ 21). Bogarowski could smell alcohol coming from Salerno later, when he was closer to him. (*Id.* at ¶ 22). Cunningham asked Salerno if he had anything to drink. Salerno said he had, and Cunningham asked him to proceed to the back of the car for the Preliminary Breath Test ("PBT"). (*Id.* at ¶ 23). Salerno testified that, although he does not drink, he had three beers. (*Id.* at ¶ 24). Salerno exited his vehicle and walked to the back of his truck which was pulled to the side of the two-lane highway

---

[1] The DVD of the stop clearly shows that Plaintiff's truck was pulled far over the white line while waiting for the light in the left-hand turn red to turn green. (Doc. 23, Ex. D, at 1:31:50-1:34:10 a.m.).

with a slight downgrade. There was a street light approximately 50 feet away and the primary lighting around Salerno was from the police vehicle. (*Id.* at ¶ 25).

Cunningham gave Salerno the PBT and then asked Salerno to perform several field sobriety tests. (*Id.* at ¶ 27). Salerno was questioned as to which direction he would like to face while performing the tests. (*Id.* at ¶ 28). Troopers are trained at the State Police Academy to explain the test, to demonstrate the test, and to have the individual perform the test. Cunningham first explained the tests and demonstrated how Salerno was to perform them. (*Id.* at ¶ 29). The field sobriety tests are a gauge used by Troopers to determine if someone is impaired or whether they are able to coordinate and operate a vehicle safely. (*Id.* at ¶ 30).

One test given to Salerno was the walk-and-turn. Salerno was supposed to walk in a straight line, touching heel to toe and count each step aloud with his arms to his side. (*Id.* at ¶ 32). During the walk-and-turn test, a subject could receive a decision point for missing a heel to toe, doing the turn improperly, raising his hands, starting too soon, or counting too many steps. (*Id.* at ¶ 34).

After the tests, Cunningham informed Salerno that he was being placed under arrest for suspicion of DUI and was going to be taken to the hospital to have the opportunity to have his blood drawn. (*Id.* at ¶ 39). Salerno informed the Troopers several times that he knew Judge Conway. (*Id.* at ¶ 40). Salerno rode to Wayne Memorial Hospital with the

Troopers and his wife followed in the truck. (*Id.* at ¶ 41). At 2:13 a.m. on October 26, 2008, Trooper Cunningham read Salerno his *O'Connell* warning. (*Id.* at ¶ 42). Trooper Cunningham read Plaintiff his Implied Consent warning at 2:14 a.m. on October 26, 2008. (*Id.* at ¶ 43). Salerno recalls Trooper Cunningham telling him that if he refused to give blood, he could go to jail for five years as stated within the second paragraph of the Implied Consent warning. (*Id.* at ¶ 44). Salerno refused to submit to blood testing, and the phlebotomist, Amy Pace, recorded the refusal at 2:20 a.m. (*Id.* at ¶ 45).

At 2:29 a.m. Salerno was given his *Miranda* warning and signed acknowledging that it had been given. (*Id.* at ¶ 46). Cunningham indicated to Salerno that he was marking the matter as a refusal and Salerno was then told he could go home. (*Id.* at ¶ 47). Out in the hospital hallway, Salerno spoke with his wife and then wanted to go back and submit to the blood test, but was told it was too late. (*Id.* at ¶ 48). Plaintiff's charges, filed by Trooper Cunningham, for the October 26, 2008 incident came later in the mail. (*Id.* at ¶ 49). Trooper Bogarowski did not file charges against Salerno. (*Id.* at ¶ 50). Plaintiff's case went to a bench trial before Judge Hamill in Wayne County in April 2009. (*Id.* at ¶ 51).

Pursuant to the Rules of Criminal Procedure, because Salerno's case was deemed a refusal, the original police report must be to the District Attorney's Office within five days. (*Id.* at ¶ 52). Within five days of October 26, 2008, Cunningham sent the original report to the District Attorney's Office with all the paperwork that he had. He did not have the MVR

video at that point, so it was not sent to the District Attorney with the original report. (*Id.* at ¶ 53). The request for a copy of the video was submitted to his supervisor within a day of Cunningham's creating the charges against Salerno. (*Id.* at ¶ 54). The protocol for copying the MVR video was new in October 2008 and this was the first time Cunningham had requested a copy of a video. (*Id.* at ¶ 55). The copy of the video would normally be given back to the Trooper in an envelope. (*Id.* at ¶ 56). The video of Salerno's October 26, 2008 stop was copied and returned to Cunningham on or about November 12, 2008. Cunningham signed an envelope stating he had acknowledged it and returned it to his supervisor to be placed in a DVD file at the barracks. (*Id.* at ¶ 57). No supplemental report or video was forwarded by the State Police to the District Attorney's Office. (*Id.* at ¶ 58).

Trooper Cunningham reviewed the original file that he sent to the District Attorney in preparation for the trial. The original file did not include anything about the DVD or video. (*Id.* at ¶ 59). Prior to Salerno's trial, Trooper Bogarowski did not review the case at all with Trooper Cunningham, nor did he provide any evidence to the District Attorney's Office. (*Id.* at ¶ 60). As of the date of Salerno's trial, Trooper Bogarowski did not know that a video of Salerno's traffic stop existed. (*Id.* at ¶ 61). When being questioned by Salerno's defense attorney, Cunningham began to think about the video. He recalled having a video made, but could not remember what case it was for. (*Id.* at ¶ 62). During a recess in the trial, Cunningham and Bogarowski went to the barracks to retrieve the video. (*Id.* at ¶ 63). The

copy of the video was in the file where the Corporal had put it. (*Id.* at ¶ 64). During the trial recess, Bogarowski viewed the video of the traffic stop for the first time. (*Id.* at ¶ 65).

Bogarowski and Cunningham gave the video to the District Attorney and it was reviewed by Cunningham, the District Attorney, the defense attorney and the judge. (*Id.* at ¶ 66). Assistant District Attorney Rick Muschlitz was the prosecuting attorney assigned to the DUI arrest of Salerno. (*Id.* at ¶ 67). At the time that Trooper Cunningham discovered the DVD and gave it to Muschlitz, the Commonwealth had already rested its case. (*Id.* at ¶ 68). Although Muschlitz believed that the Commonwealth would no longer be able to use the MVR as part of the prosecution against Salerno, he felt it necessary to bring the matter to the court's attention. (*Id.* at ¶ 69).

Before trial resumed, Muschlitz and Cunningham viewed the MVR recording. The MVR was consistent with Bogarowski and Cunningham's testimony. (*Id.* at ¶ 70). At 1:24 the non-jury trial resumed and defense counsel informed the Court that the video of the traffic stop had been recovered over the lunch hour. (*Id.* at ¶ 71). Defense counsel moved for the Court to require the District Attorney's Office to offer ARD. The Court denied the motion and indicated it was without authority to do so. (*Id.* at ¶ 72).

Upon a motion for dismissal by the defense attorney regarding the MVR video, Judge Hamill postposed the trial to allow for the filing of legal briefs on the matter. (*Id.* at ¶ 73). The Judge denied the defense's motion for dismissal of the charges but ruled that the

Commonwealth was sanctioned from using the MVR. However, the defense was permitted to use the video and get "every possible benefit the client could get from that video." (*Id.* at ¶ 74). Salerno testified on his own behalf in the second portion of the trial but the MVR was not presented. (*Id.* at ¶ 75). On August 12, 2009, Judge Hamill rendered his verdict holding that Salerno was not guilty of the charges of driving under the influence of alcohol, failure to stop at a red light, and careless driving. (*Id.* at ¶ 76).

Prior to October 26, 2008, Trooper Bogarowski had no knowledge of the light at the intersection of SR 191 being broken. (*Id.* at ¶ 77). As of August 30, 2012, Trooper Bogarowski still had no knowledge that the light at the intersection of SR 191 was ever broken. (*Id.* at ¶ 78).

## Facts in Dispute

Cunningham testified that he detected the odor of alcohol on Salerno's breath, saw that Salerno's eyes were glossed over, blurred, and bloodshot, and Salerno's speech appeared to be slow, nervous, and stuttered. (Cunningham Dep., Doc. 20-3, Ex. B, at 15:18-16:3, 18:3-7). Bogarowski testified that he observed Salerno's eyes and he appeared to be intoxicated. (Bogarowski Dep., Doc. 20-4, Ex. C, at 10:1-4). Plaintiff disputes the truthfulness of this testimony. (Pl's. SOF, at ¶¶ 20, 26).

Defendants testified that the field sobriety tests are measured on a decision point system. If the subject receives more than the allotted points, the Trooper could determine

that they showed a positive reaction to being under the influence of alcohol or that they failed the sobriety tests. (Bogarowski Dep. at 14:7-23; Cunningham Dep. at 23:16-23). Plaintiff objects because he "believes field sobriety tests are not measured on a pass-fail basis. (Pl's. SOF at ¶ 31).

Cunningham testified that in both the walk-and-turn test and one-leg-stand test, two decision points is a failure. (Cunningham Dep. at 24:14-21, 25:8-15). Plaintiff "does not agree that two points is a failure." (Pl's. SOF at ¶¶ 33, 36). Cunningham testified that Salerno turned wrong, missed heel to toe several times during the walk-and-turn test. (Cunningham Dep. at 26:17-23). He also testified that Salerno miscounted and put his foot down during the one-leg-stand test. (*Id.* at 25:16-18). Finally, Cunningham testified that Salerno was told to count up from 1001 while performing the one-leg-stand test. He counted "one-thousand one, one-thousand two, one-thousand three, one-thousand four, one-thousand five, one-thousand *one* six, one-thousand *one* seven, one-thousand *one* eight, one-thousand *one* nine, one-thousand ten." (*Id.* at 21:11-13). Plaintiff objects that these statements are "not fact but merely the opinion of the Defendant that the Plaintiff performed the field sobriety test in this manner." (Pl's. SOF at ¶¶ 35, 37, 38).

### III. Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment

"should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir.1990). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992).

## IV. Analysis

To establish a *prima facie* case under 42 U.S.C. § 1983, plaintiffs must demonstrate that: (1) they were deprived of a federal right; and (2) the person who deprived them of that

10

right acted under color of state law. *Burrella v. City of Philadelphia*, 501 F.3d 134, 139 (3d Cir. 2007). Section 1983 is not an independent source of substantive rights, but merely "provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." *Kopec v. Tate*, 361 F.3d 772, 775–76 (3d Cir. 2004).

> To prevail on a malicious prosecution claim under section 1983, a plaintiff must show that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*McKenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009).

There is no dispute that Plaintiff has met the second and fifth elements of a malicious prosecution claim. On August 12, 2009, Judge Hamill found Salerno not guilty of the charges of driving under the influence of alcohol, failure to stop at a red light, and careless driving. (Pl's. SOF at ¶ 76). In addition, Plaintiff suffered a deprivation of liberty when he was placed under arrest and taken to the hospital to have his blood drawn. (*Id.* at ¶ 39).

### Whether Defendants Initiated a Criminal Proceeding

Defendant Bogarowski argues that he took no action to initiate criminal proceedings against Plaintiff, and therefore, Plaintiff has failed to establish a *prima facie* case against him.

11

"Although prosecutors rather than police officers are generally responsible for initiating criminal proceedings, an officer may, however, be considered to have initiated a criminal proceeding if he . . . knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion." *Henderson v. City of Philadelphia*, 853 F. Supp. 2d 514, 518 (E.D. Pa. 2012) (finding a genuine issue of material fact existed as to whether Gress, a police officer, "initiated criminal proceedings" against Henderson when Gress filed a Criminal Complaint against the plaintiff, served as "the complainant for the Criminal Complaint against Henderson, charges were brought against Henderson "based on his recounting of the incident," and third-party witnesses contradicted Gress's account as to what happened between Henderson and Gress); *see also Gallo v. City of Philadelphia*, 161 F.3d 217, 220 n.2 (3d Cir. 1998) ("Decisions have recognized that a § 1983 malicious prosecution claim might be maintained against one who furnished false information to, or concealed information from, prosecuting authorities.").[2]

"It is not necessary that defendant initiate the proceedings himself. Liability for malicious prosecution can also attach when defendant influences a third party to initiate the proceedings." *Bristow v. Clevenger*, 80 F. Supp. 2d 421, 432-33 (M.D. Pa. 2000) (rejecting a police officer-defendant's arguments that "he did not swear out the complaint or explicitly direct that the prosecution be started" and therefore could not have initiated criminal proceedings because "Defendants both participated in bringing the criminal complaint

---

[22] This element overlaps with Pennsylvania's common law tort of malicious prosecution. *See Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 791 (3d Cir. 2000).

12

against Plaintiff. They spoke to a second prosecutor when the first prosecutor would not authorize the criminal proceeding. There is evidence that they did not disclose all material information to the second prosecutor.") (citing *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 464 (3d Cir. 1993)).

The undisputed facts show that Defendant *Cunningham* questioned Plaintiff, administered the PBT and field sobriety tests, arrested Plaintiff, and informed Plaintiff that Cunningham would report that Plaintiff refused to give blood. (*Id.* at ¶¶ 17-19, 23-25, 27-29, 32, 39, 42-44, 47). Plaintiff then received criminal charges that Cunningham filed for the arrest by mail. (*Id.* at ¶ 49). It was Cunningham who sent the original report to the District Attorney's Office with supporting paperwork, and Cunningham who reviewed the original file that he sent to the District Attorney in preparation for the trial. (*Id.* at ¶¶ 53, 59).

Furthermore, Plaintiff acknowledges that Defendant Bogarowski did not file charges against him. (*Id.* at ¶ 50). He also concedes that before his trial, Bogarowski did not review the case at all with Trooper Cunningham, nor did he provide any evidence to the District Attorney's Office. (*Id.* at ¶ 60). Furthermore, as of the date of Plaintiff's trial, Bogarowski did not know that a video of Salerno's traffic stop existed. (*Id.* at ¶ 61).

There is no evidence that Bogarowski "knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion," or that he

13

"influence[d] a third party to initiate the proceedings." *Henderson*, 853 F. Supp. 2d at 518; *Bristow*, 80 F. Supp. 2d at 433.

Based on the undisputed facts, it is clear that only Defendant Cunningham initiated criminal proceedings against Plaintiff. Thus, Defendant Bogarowski is entitled to summary judgment because he did not initiate criminal proceedings against Salerno.

### Probable Cause[3]

Plaintiff advances numerous arguments claiming there was no probable cause to arrest him.

First, Plaintiff argues without citing to any authority that Pennsylvania's field sobriety tests are not administered on a pass-fail system. The case law does not bear this argument out. *Snyder v. Commonwealth Dep't of Transp.*, 2 A.3d 758, 759 (Pa. Commw. Ct. 2010) (Licensee submitted to "a series of standardized field sobriety tests, which he *failed*. Licensee additionally submitted to a portable breath test, which tested positive for the presence of alcohol. After failing the field sobriety tests and the portable breath test, Officer Hillgartner placed Licensee under arrest for DUI.") (emphasis added); *Commonwealth v. Weaver*, 768 A.2d 331, 334 (Pa. Super. Ct. 2001) (approving of the trial court's jury instructions which stated, in part, "I caution you that this videotape does not show anything

---

[3] Plaintiff has admitted that he ran a red light when making a left-hand turn onto SR 191. (Pl's. SOF at ¶¶ 13-14). Such a traffic violation would justify a stop. *Whren v. United States*, 517 U.S. 806, 810, 116 S. Ct. 1769, 1772, 135 L. Ed. 2d 89 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). Plaintiff does not appear to dispute that Defendants had "reasonable belief" to stop his car. The sole issue is whether they had probable cause to arrest him for drunk driving.

14

below the defendant's knees, and that, therefore, some of the indicators or clues or factors that are necessary to decide whether the defendant *passed or failed* any of the field sobriety tests in this case, are not shown on this videotape.") (emphasis added); *Commonwealth v. Ziegelmeier*, 685 A.2d 559, 560 (Pa. Super. Ct. 1996) ("Officer Pepperman noticed that appellant had slurred speech and bloodshot eyes, and administered standardized field sobriety tests, which appellant *failed*. He was then arrested for driving under the influence of alcohol.") (emphasis added).

Second, argues that Defendant Cunningham failed to conform to the requisite standards when administering the field sobriety tests, and he specifically cites to three standardized tests: a "horizontal gaze nystagmus" test, a "walk and turn" test, and a "one-leg stand" test.[4] Defendants' police report indicates that they administered the one-leg stand test and walk-and-turn test, but not the horizontal gaze nystagmus test. In addition, Defendants administered non-standardized tests, such as having Plaintiff count upwards from one thousand, as opposed to beginning from one. (Pl's. SOF at ¶ 38).

---

[4] The United States Supreme Court has described the three tests as follows:

The "horizontal gaze nystagmus" test measures the extent to which a person's eyes jerk as they follow an object moving from one side of the person's field of vision to the other. The test is premised on the understanding that, whereas everyone's eyes exhibit some jerking while turning to the side, when the subject is intoxicated "the onset of the jerking occurs after fewer degrees of turning, and the jerking at more extreme angles becomes more distinct." 1 R. Erwin et al., Defense of Drunk Driving Cases § 8A.99, pp. 8A–43, 8A–45 (1989). The "walk and turn" test requires the subject to walk heel to toe along a straight line for nine paces, pivot, and then walk back heel to toe along the line for another nine paces. The subject is required to count each pace aloud from one to nine. The "one leg stand" test requires the subject to stand on one leg with the other leg extended in the air for 30 seconds, while counting aloud from 1 to 30.

*Pennsylvania v. Muniz*, 496 U.S. 582, 585, n.1, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990).

Plaintiff contends that Defendants' failure to administer the horizontal gaze nystagmus casts doubts on whether probable cause existed to arrest him. In support of his argument, he attaches an exhibit from the National Highway and Traffic Safety Administration ("NHTSA"), entitled "Development of a Standardized Field Sobriety Test." (Doc. 29-1, Ex. A). The document states that "[v]ariations from ideal conditions, and deviations from the standardized procedures, might affect the evidentiary weight that should be given to test results." (*Id.* at 4). This statement, however, does not necessarily lead to the conclusion that probable cause was lacking in this case. Furthermore, the document goes on to state that:

> [c]ourts in several states have reviewed the admissibility of field sobriety tests that assess physical coordination and have held that deviations in the administration of the tests should not result in the suppression of test results. These courts have found that field sobriety tests, including the Walk-and-Turn and the One-Leg-Stand of the SFST battery, are simple physical dexterity exercises that can be interpreted by an officer in the field, and by others in a court of law.

(*Id.*). Therefore, even assuming that this document had any authoritative value or precedential effect on this court, any alleged deviations from suggested best practice do not prove Defendant Cunningham lacked probable cause existed to arrest Plaintiff.

Despite these misplaced arguments, the Court finds there are questions of fact as to whether probable cause existed to arrest Plaintiff. "Generally, the question of probable

cause in a section 1983 damage suit is one for the jury." *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003) (internal citation and quotation marks omitted).

Cunningham testified that he smelled alcohol on Salerno's breath, that Salerno's eyes were bloodshot, and that Salerno's speech was slow, nervous, and stuttered, all of which Salerno denies. At the summary judgment stage, the Court cannot credit Cunningham's testimony as objective fact. The credibility of Defendant Cunningham is an issue that must be determined by a jury.

Furthermore, while the MVR does show that Salerno (1) miscounted and put his foot down during the one-leg stand test and (2) mis-stepped during the walk-and-turn test, reasonable jurors might differ as to whether Salerno actually failed any of the sobriety tests. Making such a determination at the summary judgment stage would require the Court to engage in inappropriate fact-finding.

Finally, the PBT administered by Defendant Cunningham yielded "a positive reaction to alcohol which was above the legal limit." (Intoxication Report, Doc. 20-5, Ex. E, at 3). The Court is disturbed that the Intoxication Report does not reflect a numeric value for Salerno's blood-alcohol content level, but rather contains the vague (and unhelpful) statement that there was "a positive reaction to alcohol which was above the legal limit."

Thus, there are questions of fact as to whether probable cause existed to arrest Plaintiff.

## Malice

"Malice may be inferred from the absence of probable cause." *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993). Because there is a question of whether probable cause existed to arrest Plaintiff, a jury might infer malice on the part of Defendant Cunningham.[5]

## Qualified Immunity

Because the jury will decide whether probable cause existed to arrest Salerno, the Court will defer ruling on whether Defendant Cunningham is entitled to qualified immunity until trial.

## V. **Conclusion**

For the foregoing reasons, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment. (Doc. 18). A separate Order follows.

Robert D. Mariani
United States District Judge

---

[5] The Court recognizes that the Third Circuit's Model Jury Instructions say "[plaintiff] must prove that in initiating the proceeding, [defendant] acted out of spite, or that [defendant] did not [himself/herself] believe that the proceeding was proper, or that [defendant] initiated the proceeding for a purpose unrelated to bringing [plaintiff] to justice."

18